**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jerry BUTLER, Defendant–Appellant.**

**No. 94–3656.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 6, 1995.

Decided Nov. 27, 1995.

Barry Rand Elden, Chief of Appeals, Cheryl Bell (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Micky Forbes (argued), People's Law Office, Chicago, IL, for Defendant–Appellant.

Before CUDAHY, FLAUM and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Following a jury trial Jerry Butler was found guilty of knowingly possessing a firearm having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g), and of possessing a firearm with an obliterated and removed serial number, in violation of 26 U.S.C. §§ 5861(h) and 5871. He appeals these convictions on several grounds. We affirm.

## I.

The facts of Butler's arrest are simple. At 6:20 a.m. on January 29, 1993, thirty to forty Chicago police officers, pursuant to a search warrant, raided the three flat residence at 1352 Laramie in Chicago, Illinois. The residence was the headquarters of reputed gang leader Willie Lloyd. When the officers entered the first floor apartment, they observed three male subjects asleep in the living room; one of these subjects was the defendant Jerry Butler. Officer George Figueroa roused Butler from the couch. On the couch, directly under where Butler was sleeping, the officer found a .25 caliber semi-automatic pistol with an obliterated serial number wrapped in a stocking cap. Knowing Butler was a convicted felon, the officer placed him under arrest for possession of a firearm.[1]

The events leading up to Butler's arrest are more complicated. The raid, during which Butler was arrested, was the culmination of almost four weeks of intense police surveillance at the three flat on Laramie. The police interest in the residence stemmed from the recent arrival of Willie Lloyd, self-proclaimed leader of the Chicago gang the Unknown Vice Lords. Lloyd was released from Logan Correctional Center on December 30, 1992. From the day of Lloyd's release through the day of the raid, the police closely monitored the daily activities at the Laramie residence. The surveillance and other information gathered by the gang crimes unit led officers to conclude that Willie Lloyd, along with his girlfriend and baby son, lived in the second floor apartment, while fellow gang members and Lloyd minions used the first floor apartment as a security checkpoint. The police observed first floor residents "screening" visitors to the building, i.e., residents were seen looking out first floor windows to identify persons at the front door before allowing them to enter. It also appeared to be first floor residents who were frisking visitors to the building and standing guard, in numbers of eight to twelve, when the gang leader entered and exited the building. On at least two occasions the week before the raid Butler was seen at the Laramie house acting in a security capacity. There was also testimony at trial that Butler lived on the first floor and was one of two gang members in charge of organizing and enforcing security for Lloyd.

---

1. Alex Wells, the second individual found sleeping in the living room was also found with a gun and was arrested for possession of a firearm by a convicted felon. The third individual in the room, Thomas Dixon, did not have a gun and was not charged with any crime.

During surveillance on January 26, 1993, Officer Eldon Urbikas observed Lloyd exit the house surrounded by his protective entourage of eight to twelve men. While Lloyd was outside, one of his men retrieved a B/S semi-automatic pistol, dark in color with a four inch barrel, from a car and handed it to him. Officer Urbikas immediately dispatched two squad car officers to the house, but the officers were unable to reach Lloyd while he was still in possession of the firearm. Officer Urbikas watched Lloyd hand the gun to an unknown person inside the house, who quickly took the gun into the house as the squad car officers approached. In order to discover the gun seen in Lloyd's possession, the police decided to seek a search warrant for the Laramie house.

To obtain the search warrant, Officer Michael Cronin, a member of the gang crimes unit and of the Laramie surveillance team, swore out an affidavit explaining why he believed there was probable cause to search the entire Laramie house—including the first and second floor apartments. The affidavit was based on the events observed by Officer Urbikas on January 26th, the general information the police had gathered regarding the use of the entire building by Lloyd and his security guards, as well as on Officer Cronin's twelve years of experience working in the gang crimes unit. Magistrate Judge Morrisey issued a warrant for the entire building based on Officer Cronin's affidavit, and pursuant to that warrant, the search was conducted that lead to Jerry Butler's arrest.

Prior to his trial, Butler filed a motion to suppress all of the evidence obtained from the first floor search. He claimed the search warrant was unconstitutionally over-broad since there was no probable cause to search the first floor apartment. Following a hearing, Magistrate Judge Ronald A. Guzman recommended that the motion be denied. The district judge, over Butler's objections, adopted the Magistrate's recommendation and denied the suppression motion. Butler also objected to the government's motion in limine to introduce evidence concerning Butler's gang membership and activities. The government sought to introduce evidence of the police surveillance and Butler's gang tatoo, as well as the testimony of fellow, immunized gang member Rick Powell. Butler argued that any probative value of this evidence was substantially outweighed by its unduly prejudicial nature. The district judge, however, granted the government's motion, with the condition that the proper name of the gang and gang leader not be used and that a limiting instruction be given.[2]

Following the disposition of the suppression motion and motion in limine, a jury trial was held. During the trial Butler sought to admit into evidence, as declarations against interest by an unavailable witness, the hearsay statements of Thomas Dixon (the individual found in the living room with Butler who was not charged with any crime). Butler intended to call Dixon to testify, however, Dixon left the state before the trial started and could not be found, despite efforts by the defense. Prior to his disappearance though, Dixon gave a statement to a defense investigator in which he claimed that he and Alex Wells (the other individual found in the living room with Butler) arrived at 1352 Laramie about thirty minutes before the raid. Butler let them into the house and retired to the bedroom, while Dixon and Wells laid down in the living room. According to Dixon, this was where the three were located when the police arrived; only after the police were in the apartment did Butler enter the living room. The police then ordered the three men up against the wall, and although Dixon could not see the officers, he stated that he heard an officer exclaim that he had found guns and that they should give them to the felons. The district court held the testimony was inadmissible, concluding that the state-

---

**2.** At the close of the case, the district judge instructed the jury as follows:

 You have heard testimony that the defendant was a member of a gang. You may consider this only for the purpose of determining whether or not the defendant knowingly possessed a firearm. You should not consider it for any other reason whatsoever. The defendant is not charged with being a member of a gang and you should not convict him of the charges in this case solely because you may find he is a member of a gang. You must place any personal feeling you have regarding gangs aside in your deliberations in this case.

ment was not sufficiently against Dixon's penal interest.

During closing argument, Butler's attorney argued that Officer Figueroa, the officer who arrested Butler, had planted the gun on Butler because he knew of his previous felony conviction. He claimed that Officer Figueroa's account of what happened should not be trusted since Officer Figueroa had been suspended once before for assaulting several gang members and planting evidence on them. In rebuttal, the prosecutor argued that what Officer Figueroa had done in the past was irrelevant to Butler, and that the defense was only attempting to smear the officer. He then stated:

> Now, the government has the burden of proof. The government has the burden of presenting evidence. That said, there's nothing preventing Mr. Murphy [defense counsel] from presenting any evidence in this case. It is a trial. And if he had any evidence that supports his view of the facts he would have submitted it to you....

The defense immediately objected and during a sidebar moved for a mistrial, claiming the comment improperly shifted the burden of proof. The court took the motion under consideration, had the remark stricken, and issued a curative instruction reminding the jury that the defendant did not have to prove anything. Upon further consideration, the district court denied Butler's motion for a mistrial, finding the comment was not improper and additionally, even it was, it was harmless.

## II.

Butler presents four grounds for reversal of his conviction: 1) the district court committed clear error in denying his motion to suppress the evidence discovered in the raid; 2) the district court abused its discretion in allowing the government to introduce the extensive, prejudicial testimony regarding Butler's gang activities; 3) the district court abused its discretion in refusing to admit into evidence the prior statement of Thomas Dixon; and 4) the district court erred in refusing to grant a mistrial following the improper comment of the prosecutor during closing

arguments. We will address each of these arguments in turn.

## A.

Butler first contends that the district court should have granted his motion to suppress evidence from the first floor raid because the search warrant was unconstitutionally overbroad. He claims that because 1352 Laramie was a multi-unit building, with three separate apartments, probable cause needed to be separately established for each unit. He argues that Officer Cronin's affidavit, although sufficient to establish probable cause for the second floor apartment where Willie Lloyd resided, was insufficient to establish probable cause for the first floor apartment, where he was found with the firearm.

■ We review a district court's decision to deny a motion to suppress for clear error. *United States v. James,* 40 F.3d 850, 874 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995); *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir.1994). Such a decision is only clearly erroneous if the reviewing court is left with the "definite and firm conviction that a mistake has been made." *United States v. Sleet,* 54 F.3d 303, 306 (7th Cir.1995); *James,* 40 F.3d at 874; *Tilmon,* 19 F.3d at 1224. Given the facts in this case, we do not find that the district court committed clear error in denying the defendant's motion to suppress.

■ The Fourth Amendment protects the right of people to be free from unreasonable searches. The search of a home for evidence of a crime is generally not unreasonable if it was conducted pursuant to a search warrant supported by probable cause. *See Darryl H. v. Coler,* 801 F.2d 893, 900 (7th Cir.1986) (citing *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)). In determining whether there is probable cause to issue a search warrant, the magistrate's task is "to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois*

*v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

■ In *United States v. Hinton,* 219 F.2d 324, 326 (7th Cir.1955), we held that when a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit. The general rule is that "a warrant which describes an entire building when cause is shown for searching only one apartment is void." *Id.* There is an exception to the *Hinton* rule, however, where "although appearing to be a building of several apartments, the entire building is actually being used as a single unit." *Id.* When this is the case, a finding of probable cause as to a portion of the premises is sufficient to support a search of the entire structure. *See United States v. Johnson,* 26 F.3d 669, 694–96 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 344, 130 L.Ed.2d 300 (1994) (where officer had good faith belief duplex was being used as a single unit, drug deals occurring on second floor supported search of entire duplex); *United States v. Whitten,* 706 F.2d 1000, 1008 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984) (if structure is used as a single unit, "a warrant may authorize a search of [an] entire street address while reciting probable cause as to only a portion of the premises...."); *United States v. Gilman,* 684 F.2d 616, 618 (9th Cir.1982). We have found the "used as a single unit" exception to apply in cases where the target of the investigation or warrant exercised "dominion and control" over the entire building or had access to the entire structure. *See Johnson,* 26 F.3d at 694; *United States v. Gusan,* 549 F.2d 15, 18 (7th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977) (warrant valid for entire residence where defendant had "dominion and control" over first floor and

used it for access to second floor gambling ring); *see also Gilman,* 684 F.2d at 618 (warrant valid for office and residence on premises since defendant was in control of the whole building); *United States v. Alexander,* 761 F.2d 1294, 1301 (9th Cir.1985) (probable cause existed to search entire ranch with several buildings since all under defendant's control); *United States v. Whitney,* 633 F.2d 902, 905–06 (9th Cir.1980), *cert. denied,* 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981); *United States v. Gonzalez,* 697 F.2d 155, 156 (6th Cir.1983).

■ In the case at hand, there is no dispute that there was probable cause to search the second floor apartment where Willie Lloyd lived. The dispositive issue then is whether the three flat was being used as a single unit by Lloyd, such that the probable cause as to the second floor was sufficient to establish probable cause for the first floor as well, or whether the apartments were completely separate units, such that a particular finding of probable cause as to the first floor was necessary. Resolution of this issue depends on whether the information in the affidavit supported the finding that Willie Lloyd exercised dominion or control over the entire three flat, including the first floor apartment. The district court, adopting the findings of Magistrate Guzman, found that Officer Cronin's affidavit did support the conclusion that all three floors at 1352 Laramie were under the control of Willie Lloyd and his entourage, and so found that the single unit exception established probable cause for the entire building.[3] We agree with the district court.

In his affidavit, Officer Cronin stated that Willie Lloyd personally lived in the second floor apartment with his girlfriend and son; that Lloyd, who had a long criminal record, was the self-proclaimed leader of the Un-

---

**3.** In finding probable cause, the magistrate appears to have relied completely on the single unit exception to *Hinton,* and therefore we review this finding under the same analysis. However, we note that the information in Officer Cronin's affidavit may have been sufficient under *Hinton* itself, i.e., it may have been sufficient to establish probable cause for the first floor as a separate unit. *See, e.g., Gonzalez,* 697 F.2d at 156 ("[t]he warrant ... is supportable under both the rule and the 'singular control' exception"); *United*

*States v. Roberts,* 747 F.2d 537, 545 (9th Cir. 1984). The affidavit relates that the gun at issue was taken into the house on the first floor, by someone suspected of living on the first floor. The magistrate notes this in his opinion, stating, "[t]here is also evidence that lookouts in this first floor apartment did on occasion possess the very gun the search warrant sought." This evidence may have supported a separate finding of probable cause for the first floor.

known Vice Lords; that three months prior to Lloyd's release the first floor apartment was vacant; that many different persons from the first floor apartment would peer out of the window when persons approached the front door of the building and would then proceed to let them into the building; that there was often a person on the landing to the building who would frisk visitors before they were allowed to enter; that when Willie Lloyd exited the building he was accompanied by a group of eight to twelve men who appeared to be under his direction and control and appeared to be acting as lookouts and bodyguards; that the police had concluded, based on their surveillance and experience, that the first floor apartment was being used as a security checkpoint for Lloyd; that several of the men who accompanied Lloyd were at some point in possession of the gun at issue and that one of these men brought the gun into the house before the police arrived. It is true that the affidavit does not directly link the men seen peering out of the first floor windows with the men who surrounded Lloyd and did his bidding. However, given Lloyd's gang affiliation, the pattern of activity at the house, and all of the affidavit information as a whole, it was a reasonable conclusion that the men controlled by Lloyd stayed in the first floor apartment under Lloyd's supervision, using it as a lookout and security checkpoint. This conclusion is supported by commonsense as well, since it is unlikely that Lloyd, who was obviously concerned for his safety, would permit anyone not associated with him or his gang to live in or have access to the building where

he resided. *See Johnson,* 26 F.3d at 695 (citing *United States v. Olson,* 978 F.2d 1472, 1478 (7th Cir.1992), *cert. denied,* 507 U.S. 997, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993)) ("incredulous" that persons not associated with drug dealer would be allowed to live in house where large drug conspiracy conducted).

■ In sum, we cannot find the district court's conclusion that Lloyd controlled the entire building and therefore that there was probable cause to search the first floor apartment was clearly erroneous.[4]

**B.**

■ Butler next contends his conviction should be reversed because the district court abused its discretion in admitting the extensive and highly prejudicial testimony on Butler's gang involvement. He argues that the evidence should have been excluded under Federal Rule of Evidence 403 because its prejudicial effect substantially outweighed its limited probative value.[5] In challenging the district court's balancing under Rule 403, Butler confronts a heavy burden. *United States v. Lewis,* 910 F.2d 1367, 1372 (7th Cir.1990); *United States v. Barnes,* 909 F.2d 1059, 1069 (7th Cir.1990). Trial judges have considerable discretion in making evidentiary rulings, and we reverse these rulings only if there was a clear abuse of that discretion. *United States v. Rodriguez,* 925 F.2d 1049, 1053 (7th Cir.1991); *United States v. Rutledge,* 40 F.3d 879, 885 (7th Cir.1994), *cert. granted,* —— U.S. ——, 115 S.Ct. 2608, 132

4. Although we find that there was probable cause to support the search of the first floor apartment, we note that even if we held the warrant to be invalid, we would nevertheless affirm the district court's decision under the good faith doctrine of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Under *Leon,* evidence is not suppressed when a police officer relies in objective good faith on a faulty but facially valid search warrant. *See United States v. Malin,* 908 F.2d 163, 166–67 (7th Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990). We agree with the district court that there is no evidence to suggest that Officer Cronin was reckless or dishonest in preparing the affidavit, or that Judge Morrisey abandoned his detached and neutral role, or that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely un-

reasonable." *Leon,* 468 U.S. at 923, 104 S.Ct. at 3420. Under the facts of this case, a reasonably well-trained officer would not have known that the search was illegal despite the magistrates's authorization, *see Malin,* 908 F.2d at 166–67 (quoting *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23), and therefore the evidence should not have been suppressed even if the search warrant was invalid.

5. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

L.Ed.2d 852 (1995); *Lewis,* 910 F.2d at 1372. We do not find an abuse of discretion in this case.

■ We recognize that evidence of gang membership is likely to be "damaging to a defendant in the eyes of the jury," and we therefore demand careful consideration by district judges in determining its admissibility. *Rodriguez,* 925 F.2d at 1053. However, even given this recognition, we have consistently held that under appropriate circumstances gang membership evidence has probative value that can outweigh claims of undue prejudice. *See id.* (gang membership admissible to show motive for robbery and reason for participation in criminal activity); *Lewis,* 910 F.2d at 1372 (gang membership admissible to prove joint constructive ownership of firearms); *United States ex rel. Hairston v. Warden,* 597 F.2d 604, 607–08 (7th Cir.), *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979) (gang membership admissible to show motive for murder); *see also United States v. McKinney,* 954 F.2d 471, 479 (7th Cir.), *cert. denied,* 506 U.S. 1023, 113 S.Ct. 662, 121 L.Ed.2d 587 (1992) (evidence of Aryan Brotherhood activities admissible "to present the complete picture of the murder and conspiracy"); *United States v. Hattaway,* 740 F.2d 1419, 1425 (7th Cir.), *cert. denied,* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984) (evidence of motorcycle gang's lifestyle admissible to provide accurate description of kidnapping victim's "ordeal"). Other circuits have reached similar conclusions. *See, e.g., United States v. Sloan,* 65 F.3d 149, 150–51 (10th Cir.1995) (gang membership admissible to prove existence of conspiracy and relationship between witnesses); *United States v. Robinson,* 978 F.2d 1554, 1562–63 (10th Cir.1992), *cert. denied,* 507 U.S. 1034, 113 S.Ct. 1855, 123 L.Ed.2d 478 (1993) (gang affiliation admissible to establish conspiracy agreement and purpose and to show knowledge of conspiracy); *United States v. Johnson,* 28 F.3d 1487, 1497 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995) (gang association admissible to prove conspiracy existed).

[9] Butler maintains that because the possession charge was a strict liability crime, the only issue at trial was whether he possessed the gun at the date and time charged, to which two officers would testify. He argues that the gang evidence, which would bear on "why" he possessed the gun, was therefore irrelevant and of little probative value. We believe, however, that the evidence of the Laramie surveillance and Butler's gang tatoo, as well as the testimony of fellow gang member Rick Powell (that Butler was a member of the gang, lived on the first floor, and coordinated security for Lloyd), was relevant to establish that Butler acted as a security guard for Willie Lloyd. And the fact that Butler held a position as a gang security guard does make it more probable that Butler possessed the gun and was aware he possessed it. *See* Fed.R.Evid. 401 ("Relevant evidence means evidence having any tendency to make the existence" of any material fact "more probable or less probable.") Although Butler is correct is arguing that the government does not have to prove why he possessed the gun, the fact that they can explain his possession does make it more likely that he actually did possess it and knowingly possessed it. Therefore, the evidence was not irrelevant, but was probative of the elements of the crime he was charged with.

■ Butler also argues that even if the evidence was probative, this probative value was substantially outweighed by the risk of unfair prejudice. As we stated, this balancing is within the sound discretion of the trial court. *Rodriguez,* 925 F.2d at 1053; *McKinney,* 954 F.2d at 479. Here, the trial judge was sensitive to the prejudicial quality of the gang evidence the government sought to admit, and carefully and thoughtfully considered the risk of undue prejudice to Butler. In the end, the court concluded that, with certain restrictions and instructions, the prejudice could be minimized so that it did not substantially outweigh the probative value of the evidence. The court therefore granted the government's motion to admit the evidence on the condition that 1) Willie Lloyd's name and the name "Unknown Vice Lords" not be used, permitting only reference to a "gang leader" or a "gang," and 2) a strong limiting instruction be given to the jury re-

garding their use of the evidence. At trial, these conditions were satisfied: neither proper name was mentioned, and the court gave a strong and careful instruction that the gang testimony should only be used to determine whether Butler possessed the gun, and not for any other purpose. We generally presume that juries follow instructions, *see McKinney*, 954 F.2d at 478, and since there is no evidence in the instant case to the contrary, we must assume the jury heeded the district court's warning. Given the district court's careful consideration of the issue, the restrictions imposed, and the strong instruction used, we cannot find that the balance struck by the trial judge was an abuse of discretion.[6]

### C.

■ Butler's third argument on appeal is that the district court erred in failing to allow defense investigator Michael Medina to testify to the hearsay statement of Thomas Dixon. Butler contends the statement should have been admitted under hearsay exception 804(b)(3) because it was a statement against penal interest by an unavailable declarant. Once again, we review district court rulings regarding the admissibility of evidence for abuse of discretion only. *United States v. Williams*, 31 F.3d 522, 527 (7th Cir.1994); *United States v. Hilgeford*, 7 F.3d 1340, 1345 (7th Cir.1993).

Rule 804(b) allows certain hearsay statements of unavailable declarants into evidence. 804(b)(3) provides:

[a] statement which ... at the time of its making ... so far tended to subject the declarant to civil or criminal liability, ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed.R.Evid. 804(b)(3). Based on the rule, we have held that in order for an exculpatory hearsay statement (exculpatory as to the defendant) to be admissible under Rule 804(b)(3), it must meet the following three-part test: (1) the declarant must have been unavailable as a witness; (2) the statement must have been against the declarant's penal interest; and (3) there must have been corroborating circumstances which clearly indicate the trustworthiness of the statement. *United States v. Garcia*, 986 F.2d 1135, 1139 (7th Cir.1993); *United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 480, 130 L.Ed.2d 394 (1994); *accord United States v. Nagib*, 56 F.3d 798, 803–04 (7th Cir.1995); *United States v. Silverstein*, 732 F.2d 1338, 1346 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985).

The 804(b)(3) test is the correct analysis for Dixon's statement, since it contains several comments which tend to exculpate Butler. First, Dixon stated that it was he—not Butler—who was laying down in the living room with Alex Wells when the police arrived, while Butler was in the bedroom. Officers found two guns in the living room; no guns were found in the bedroom. The statement is also exculpatory as to Butler because Dixon claimed that after the police had them up against the wall, he heard an officer exclaim that he had found guns and that they should give them to the felons.

Applying the three-part test to the statement at issue, we find the first prong of the test is satisfied, as the parties agree that Thomas Dixon was unavailable to testify. Butler maintains the second prong, that the statement be against Dixon's penal interest, is also satisfied because Dixon placed himself in the room where the weapons were found, thereby risking possible weapons charges being brought against him. The district court judge, however, determined that Dixon's statement was not sufficiently against his

---

**6.** Our decision today should not be construed as a blanket rule allowing the admission of gang membership in all strict liability gun possession cases. We hold only that under the particular facts of this case (i.e. that Butler was acting as a security guard for a gang leader and possessed the gun as part and parcel of those duties), where there is a strong and direct link between the gang activity introduced and the possession of the firearm, that the district court did not err in finding the evidence more probative than prejudicial.

penal interest to warrant its admission under the exception. We agree with the district court.

■■■ The hearsay exception does not provide that any statement which "possibly could" or "maybe might" lead to criminal liability is admissible; on the contrary, only those statements that "so far tend to subject" the declarant to criminal liability, such that "a reasonable person would not have made it unless it were true" are admissible. Fed. R.Evid. 804(b)(3). Dixon, though placing himself in the room where the guns were found, did not admit to anything remotely criminal: he did not admit that he had possession of any gun, that any gun was his, that he had knowledge of any guns, that any gun was even in the living room, or that he or any gun was on the couch. It was not even alleged that Dixon was a convicted felon, such that mere possession of a firearm would be illegal conduct. Dixon's statement, at most, placed him at risk of being in some type of "constructive possession" of a weapon which, we agree with the district court, is not a risk sufficient to provide the guarantee of reliability or truthfulness the 804(b)(3) exception is based on. *See Williamson v. United States*, —— U.S. ——, ——, 114 S.Ct. 2431, 2432, 129 L.Ed.2d 476 (1994) ("Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true."). Nowhere in Dixon's statement did he so far tend to subject himself to criminal liability such that we can be confident in the veracity of his comments, and therefore we cannot justify the admission of his statement under the exception.[7]

Further, assuming the statement was against Dixon's penal interest, the statement would still be inadmissible because Butler cannot hurdle the last requirement of the three-part analysis—that there be corroborating circumstances that speak to the trustworthiness of the statement. First, there is no direct evidence which corroborates Dixon's exculpatory comments. Butler claims that the testimony of the police officers is corroborating because it supports that Dixon was in the room. This fact, however, is not in dispute, and it does nothing to corroborate the exculpatory parts of Dixon's statement (i.e., that Butler was not in the living room and that the police planted the guns on the felons). The testimony of the police cannot possibly support the trustworthiness of these statements since it directly conflicts with them.

In addition, the circumstances surrounding Dixon's statement do not buttress its trustworthiness. We have previously listed several factors to consider in determining if corroborating circumstances exist, including: 1) the relationship between the confessing party and the exculpated party; 2) whether the confessor made a voluntary statement after being advised of his Miranda rights; and 3) whether the statement was made in order to curry favor with the authorities. *Garcia*, 986 F.2d at 1140; *Nagib*, 56 F.3d at 805. Although Dixon was not attempting to curry favor with the authorities, the other two factors cut against the statement's trustworthiness. First, the fact that Dixon was a member of the same gang as Butler and a nephew of the street gang leader suggests that Dixon could be fabricating his story in order to benefit his fellow gang member. *See Silverstein*, 732 F.2d at 1346. Second, the statement was voluntary, but it was not made when Dixon knew it could be used against

---

7. We also note that even if we found Dixon's statement placing himself in the living room to be against his penal interest, this would not be sufficient to declare Dixon's entire statement admissible. The Supreme Court recently held in *Williamson v. United States*, —— U.S. ——, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), that for purposes of 804(b)(3), non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory, are not admissible. *Id.* at ——, 114 S.Ct. at 2432. Under *Williamson*, then, each portion of a statement must be analyzed to determine if it tended to subject the declarant to criminal liability. *Nagib*, 56 F.3d at 804. Applying this analysis to our case, it is clear that the other statements in Dixon's narrative, including the fact that Butler was in the bedroom and that the police exclaimed that they should plant the guns on the felons, had absolutely no tendency to subject Dixon to criminal liability. Therefore, under *Williamson*, these statements would not be admissible even if we found the living room statement to be against Dixon's penal interest.

him in a court of law; it was made when it could only be used to help his friend.

Therefore, because we agree with the district court that Dixon's statement was not against his penal interest, and further find that there were no corroborating circumstances, we conclude the district court was correct in rejecting the testimony.

## D.

■ Finally, Butler challenges the district court's denial of a mistrial following the allegedly improper and prejudicial comments of the prosecutor during closing argument. He argues that the prosecutor's statements impermissibly taxed his privilege against self-incrimination. We review a district court's grant or denial of a mistrial for abuse of discretion, and "we assume that the trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial." *United States v. Humphrey,* 34 F.3d 551, 556 (7th Cir.1994) (quoting *United States v. Canino,* 949 F.2d 928, 937 (7th Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546.)

■ We follow a two-step analysis in assessing allegations of prosecutorial misconduct during closing argument. We begin by looking at the disputed remarks in isolation to determine if they were proper. If we find the comments were proper, our analysis ends. If, however, we find the comments were improper, we must then look at the remarks in light of the entire record to determine if the defendant was deprived of a fair trial. *United States v. Badger,* 983 F.2d 1443, 1450 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993); *United States v. Osuorji,* 32 F.3d 1186, 1191 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 919, 130 L.Ed.2d 799 (1995). In

determining the effect on the fairness of the trial we consider: 1) the nature and seriousness of the prosecutorial misconduct; 2) whether the prosecutor's statements were invited by conduct of defense counsel; 3) whether the trial court instructions to the jury were adequate; 4) whether the defense was able to counter the improper arguments through rebuttal; and 5) the weight of the evidence against the defendant. *Badger,* 983 F.2d at 1450; *Osuorji,* 32 F.3d at 1191.

■ Applying these principles to the case at hand, our first step is to determine if the prosecutor's comment improperly burdened Butler's privilege not to testify.[8] The Supreme Court has held that it is a violation of the fifth amendment privilege against self-incrimination for a prosecutor to directly and adversely comment on the defendant's failure to testify on his own behalf. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). We have held that an *indirect* comment on the defendant's failure to testify may also violate the fifth amendment if the remark was "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Lyon,* 397 F.2d 505, 509 (7th Cir.), *cert. denied,* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968); *United States v. Goodapple,* 958 F.2d 1402, 1405 (7th Cir.1992); *United States v. Perez,* 870 F.2d 1222, 1229 (7th Cir.), *cert. denied,* 493 U.S. 844, 110 S.Ct. 136, 107 L.Ed.2d 95 (1989). A prosecutor's comment on the uncontradicted nature of the evidence or on the failure of the defense to present evidence or call witnesses is improper under this standard where the defendant is the only one who could be called or who could rebut the evidence. *United States v. Sblendorio,* 830 F.2d 1382, 1391 (7th Cir.1987), *cert. denied,* 484 U.S. 1068, 108

---

8. Although it is unclear from the brief, Butler apparently makes a separate argument that the prosecutor's comments improperly shifted the burden of proof. However, where the jury has been properly instructed that the prosecution has the burden of proof, we have held that a prosecutor may argue inferences based on the balance or lack of evidence, provided the remarks do not indirectly draw an adverse inference regarding the defendant's failure to testify. *United States v. Sblendorio,* 830 F.2d 1382, 1391–93 (7th Cir.

1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988) (prosecutors may "pursue evidentiary inferences for what they are worth"). Therefore, because the dispositive question is whether the comments impermissibly remarked on the defendant's silence, and therefore violated the fifth amendment, this is the issue we must focus on. *Sblendorio,* 830 F.2d at 1391 ("the defendant's arguments about burden-shifting are offshoots of *Griffin v. California* ").

S.Ct. 1034, 98 L.Ed.2d 998 (1988); *United States ex rel. Adkins v. Greer*, 791 F.2d 590, 597 (7th Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 584, 93 L.Ed.2d 586 (1986); *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1300 (7th Cir.1985). However, a prosecutor's comment regarding the balance of evidence or its unrefuted nature is not improper and does not tax the self-incrimination privilege where there are other witnesses who could provide the rebuttal evidence. *Kurina v. Thieret*, 853 F.2d 1409, 1416 (7th Cir.1988), *cert. denied*, 489 U.S. 1085, 109 S.Ct. 1544, 103 L.Ed.2d 848 (1989); *United States v. DiCaro*, 852 F.2d 259, 263 (7th Cir.1988) (comment impermissible "only if it is highly unlikely that anyone other than the defendant could rebut the evidence"); *Adkins*, 791 F.2d at 597–98; *United States v. Castillo*, 965 F.2d 238, 244 (7th Cir.), *cert. denied*, 506 U.S. 874, 113 S.Ct. 212, 121 L.Ed.2d 152 (1992) (proper to comment that no evidence supported defendant's defense).

 The prosecutor's comment in this case was clearly not a direct remark on Butler's decision not to testify. The defense argued during closing that Officer Figueroa planted the gun on Butler and that Officer Figueroa should not be believed because he had planted evidence in the past. In response, the prosecutor argued that what Officer Figueroa may have done in the past was irrelevant, and that the defense was simply attempting to smear the officer. Directly following this argument, the prosecutor stated: "there is nothing preventing Mr. Murphy [defense counsel] from presenting any evidence in this case. It is a trial. And if he had any evidence that supports his view of the facts he would have submitted it to you . . . ." The comment was addressed to defense counsel, Mr. Murphy and referred to "any evidence"; it did not directly refer to Mr. Butler's testimony.

 We also agree with the district court that the remark was not an improper indirect comment on Butler's silence. We do not find that the prosecutor's remarks were "manifestly intended" to be a comment on Butler's silence, nor do we believe the jury would "naturally and necessarily" take them as such. When viewed in context, the prosecutor's statement was a reference to the defense's failure to support their theory that Officer Figueroa lied about finding Butler with the gun. It was an indirect way of stating that the prosecution's witnesses were uncontradicted and unrebutted and therefore should be believed. As we set forth above, this is proper comment as long as Butler is not the only one who could have supported the theory or rebutted the prosecution's witnesses. There were several police officers and other gang members present when Butler was arrested, any one of whom could have provided the necessary evidence to support Butler's theory. In other words, whether Officer Figueroa planted any gun, or made any remark about doing so, was not information that would only be known to Butler. *Contra Burke*, 756 F.2d at 1300 (unrebutted testimony was contents of conversation between defendant and government witness); *United States v. Buege*, 578 F.2d 187 (7th Cir.), *cert. denied*, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978) (unrebutted evidence was substance of phone call between government witness and defendant). When there are other witnesses available, and especially where the defense theory rests on the unreliability of the government's witnesses, "the prosecutor may imply that the failure of the defense to present available evidence (other than the defendant's testimony) in opposition to the government's witnesses supports a conclusion that the government's witnesses are reliable." *DiCaro*, 852 F.2d at 263 (quoting *Sblendorio*, 830 F.2d at 1392). Therefore, although we always urge prosecutors to be cautious in making this type of statement, we find the prosecutor's comment was proper in this instance.

 We further find that even if the comment was improper, it did not prejudice Mr. Butler so much as to deprive him of a fair trial. The comment was a single, isolated, indirect remark which did not stress an inference of guilt and which the prosecutor explained to the jury. *See Osuorji*, 32 F.3d at 1192. In addition, the comment could be viewed as invited by the defense's attack on the credibility of Officer Figueroa. Finally, the court immediately had the comment stricken from the record and gave a curative

instruction, which the prosecutor reiterated upon resuming his argument. *See Badger,* 983 F.2d at 1451; *United States v. Koen,* 982 F.2d 1101, 1118 (7th Cir.1992). All of this combined with the strong case against Butler leads us to find the comment, if improper, would have been harmless error.

For all of the foregoing reasons, the conviction of Jerry Butler is AFFIRMED.