Robert M. LEVINE, Movant,

v.

UNITED STATES of America,
Respondent.

No. 2:97–CV–164.

United States District Court,
N.D. Indiana,
Hammond Division.

Oct. 21, 1998.

Robert M. Levine, Florence, CO, pro se.

Andrew B. Baker, Jr., U.S. Atty's Office, Dyer, IN, for Respondent.

### ORDER

LOZANO, District Judge.

This matter is before the Court on the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, filed by Movant, Robert M. Levine, on April 29, 1997. For the reasons set forth below, this motion is **DENIED,** and the Clerk is **ORDERED** to enter judgment dismissing this section 2255 case with prejudice.

### I. BACKGROUND

Robert Levine was accused of hiring Bruce McKinney to kill Levine's brother, Donald, his brother's wife, Marsha, and his brother's son, Mark. Donald and Marsha were murdered; Mark escaped. In July 1991, a jury convicted Levine of conspiring to use and using interstate commerce to effect murder-for-hire in violation of 18 U.S.C. sections 371 and 1958. Levine was sentenced to life imprisonment without parole one each of the four section 1958 counts, and five years on the section 371 count, with the sentences to run concurrently.

Levine's case has progressed through four attorneys and a variety of involved proceedings. Levine's trial counsel was Kevin Milner, a former Assistant U.S. Attorney. The trial ran for over three weeks. Shortly after trial, Levine filed a motion for acquittal or a new trial before this Court, which was denied. Levine then took an unsuccessful appeal, represented by Richard Kling, a prominent criminal defense attorney and law professor. *United States v. Levine,* 5 F.3d

1100 (7th Cir.1993). Next, Levine filed a motion for a new trial characterized as one under Federal Rule of Criminal Procedure 33. (Unless otherwise noted, "the new trial motion" refers to this motion rather than the earlier one seeking a new trial.) Attorney Rebecca Donaldson prepared the new trial motion pro bono. Donaldson represented herself as working exclusively in the field of criminal defense post-conviction and appellate work, having represented defendants in such matters since 1989. Levine moved to have Donaldson appointed as CJA counsel on the new trial motion. The Court refused to appoint Donaldson, but did appoint an experienced attorney from the local CJA panel, John Maksimovich, who took up Levine's representation on the new trial motion. The Court denied the new trial motion. Represented by Maksimovich, Levine appealed that ruling and the Seventh Circuit affirmed in an unpublished order. While the appeal was pending, Levine filed the present pro se motion under 28 U.S.C. section 2255. Levine moved to have counsel represent him on the section 2255 motion. The Court denied that motion based on the nature of Levine's motion and his being well-educated (including some law school) and an experienced business person. The Court still believes that Levine's motion does not warrant appointed counsel.

Through the course of preliminary briefing and rulings, the Court limited the issues of Levine's motion that would receive further consideration to those enumerated in an order issued on January 13, 1998. The Government filed a response on those issues, and Levine filed a reply. Along the way, Levine tried to get the Court to recuse without success, and he tried to add new issues to his motion with limited success. The Court is now prepared to rule on all remaining issues raised by Levine's section 2255 motion. Because all issues can be resolved without having to resolve genuine conflicts in evidence, an evidentiary hearing is not needed.

### II. DISCUSSION

The Court notes at the outset that much of Levine's reply brief is devoted to asking for reconsideration of the January 1998 ruling

where the Court identified the issues Levine raised in his section 2255 motion that warranted further briefing, and those that were rejected out of hand. To the extent that Levine simply questions the reasoning used in rejecting issues, the Court stands by that reasoning. To the extent that Levine attempts to inject new issues or reformulate former ones to sidestep the earlier ruling, the Court rejects Levine's efforts. Levine may not use a reply brief to effectively add new issues at this late stage of exhaustively briefed section 2255 proceedings. *See James v. Sheahan,* 137 F.3d 1003, 1008 (7th Cir. 1998). In the earlier ruling the Court clearly identified the issues that it would consider further and in the present ruling will address only those issues.

A. Challenges to effectiveness of counsel with a basis in the record

■ With a few exceptions covered separately later, the basis for Levine's section 2255 motion is in the trial and appellate record, and thus the motion amounts to a challenge to the effectiveness of his trial and appellate counsel. Levine principally challenges the conduct of four persons: his trial counsel, his appellate counsel, the AUSA who handled his case, and the Court. The challenges of trial and appellate counsel are expressly ineffective assistance challenges. The challenges of the AUSA and the Court are not expressly such challenges, but must necessarily amount to such challenges. This is so because the entire basis for the challenges was in the record during Levine's trial and appeal, meaning that counsel could have raised them at trial or on appeal. *See United States v. Taglia,* 922 F.2d 413, 418 (7th Cir.1991). Levine may not raise in a section 2255 motion previously available issues unless he shows cause for and prejudice from failing to raise them before, or that it would be a fundamental miscarriage of justice for the district court not to address them. *Id.; McCleese v. United States,* 75 F.3d 1174, 1177–78 (7th Cir.1996); *Cabello v. United States,* 884 F.Supp. 298, 301 (N.D.Ind.1995).

Levine does not really address this procedural default doctrine except to generally suggest that his counsel were ineffective.

So, the Court will consider cause and prejudice. Cause can exist if counsel rendered ineffective assistance by not raising the issues before, *McCleese,* 75 F.3d at 1179–80; *Barker v. United States,* 7 F.3d 629, 632 (7th Cir.1993); *Cabello,* 884 F.Supp. at 301–02, thus bringing the Court to the point stated at the outset: Levine ultimately, necessarily, and largely raises a challenge to his lawyers' effectiveness in his present section 2255 motion.

Ineffective assistance arguments are governed by the test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* established a two-prong test. First, the defendant must show that counsel's performance fell below the standard of the Sixth Amendment. 466 U.S. at 687, 104 S.Ct. 2052. Specifically, the defendant must show that counsel's performance " 'fell below the objective standard of reasonableness' and 'outside the wide range of professionally competent assistance.' " *Barker,* 7 F.3d at 633 (quoting *Strickland* ). Under the second prong, prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

■ 1. Turning to specifics, Levine argues that the indictment was improper because the section 1958 murder-for-hire counts did not "indicate that murder violated the law, [and] didn't indicate that the law was specifically violated in Indiana, or if so which statute of the Indiana law it violated." Br. p. 48. An indictment need only (1) state the elements of the offense charged, (2) fairly inform the defendant so that he or she may prepare a sufficient defense, and (3) enable the defendant to use an acquittal or conviction as a bar to future prosecution for the same offense. *United States v. Yoon,* 128 F.3d 515, 521–22 (7th Cir.1997). In reviewing an indictment for sufficiency, a court should not read it in a hypertechnical manner. *Id.*

■ Levine's indictment alleged that he traveled in interstate commerce with the in-

tent that "murders ... be committed in violation of the laws of the State of Indiana." The offense statute prohibits interstate travel "with the intent that a murder be committed in violation of the laws of any State." 18 U.S.C. § 1958(a). The indictment adequately informed Levine of the charges against him. Counsel were not ineffective by failing to argue otherwise.

■ 2. On a similar note, Levine argues that the Court should have instructed the jury on what constitutes murder under Indiana law for purposes of the murder-for-hire counts. The jury was instructed that one element of those counts was that Levine intended "that a murder be committed in violation of the laws of any state or the United States." Tr. 3755. As Levine stresses, the instructions did not define what constituted murder in Indiana. However, the Court took judicial notice of and the AUSA read to the jury the relevant statute, saying, "Murder in the State of Indiana is defined, as, quote, a person who, number one, knowingly or intentionally kills another human being...." TR. 3244. Also, the jury heard evidence that McKinney had agreed to plead guilty to Indiana murder charges. Tr. 1230, 1234–35. Given the specific information available to the jury to assist in determining whether McKinney had committed a "murder in violation of the laws of any state," trial and appellate counsel did not render ineffective assistance by not insisting on a specific instruction that repeated the same information.

■ 3. Likewise, Levine argues that the jury was not adequately instructed regarding the "consideration" mentioned in the murder-for-hire statute. An instruction defined consideration as "the cause, motive, price, or influence which induces a party to enter into an agreement." Tr. 3755–56. Levine does not suggest this instruction was improper, but incomplete. He says the jury should have been instructed that consideration does not include illusory promises. According to Levine, his promise to make McKinney a "millionaire," Tr. 1284–85, in exchange for the murders was illusory. An illusory promise is "an expression cloaked in promissory terms, but which, upon closer examination, reveals that the promisor has not really com-

mitted himself to anything." *Black's Law Dictionary* 749 (6th ed.1990). In common parlance, "millionaire" means "one whose wealth is estimated at a million or more (as of dollars or pounds)." *Webster's Ninth New Collegiate Dictionary* 755 (1986). By his promise to make McKinney a millionaire in exchange for the killings, Levine clearly committed to increasing McKinney's wealth to a million dollars or more. That promise was not illusory.

Levine also suggests that the jury might have improperly viewed as consideration his merely reimbursing McKinney for expenses he incurred in carrying out the attacks. Assuming that such reimbursement was not consideration as defined above, Levine still promised to make McKinney a millionaire. Levine suggests that the jury might have rejected the millionaire promise as consideration and seized on the reimbursement as consideration instead. Common sense dictates that in a murder-for-hire case the jury would not have ignored the promised payment for the murders and gotten sidetracked on some less prominent type of potential consideration.

The likelihood of the jury being misinformed or confused without further instructions was slight, so trial and appellate counsel had no constitutional obligation to insist on the type of instruction that Levine says was needed.

■ 4. Levine argues that he was prejudiced by being called a "murderer," "thief," and like things throughout the trial. Levine mischaracterizes and exaggerates the impact of statements referring to his alleged embezzlement from Donald and participation in the killings of Donald and Marsha, which were, after all, "murders." This case was about whether Levine orchestrated the murders because he was embattled with his brother and wanted his fortune. Such a trial cannot be conducted without some unfavorable references to Levine's character and behavior. In the same vein, Levine objects to testimony about the details of the murders despite the fact that his counsel offered to stipulate that the murders occurred. The single case Levine cites to support this point, *Old Chief v.*

*United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (U.S.1997), was not available to Levine's counsel in 1991 and 1993, and in any event is confined to cases where the defendant offers to stipulate to having a certain status that is itself an element of the crime. *United States v. Rezaq,* 134 F.3d 1121, 1137 (D.C.Cir.1998), *cert. denied,* 1998 WL 249071 (U.S. Oct.5, 1998). Indeed, *Old Chief* itself stresses that abstract stipulations do not pack the punch of compelling narrative evidence, which can crystallize the jury's will to perform the unpleasant task of convicting another human being. *Old Chief,* 117 S.Ct. at 653–54. Ordinarily, a prosecutor can employ that punch. *Id.*

■ Levine has not showed that trial counsel would have won objections to the unfavorable references. Moreover, defense counsel must pick their battles, and those who object reflexively to every bit of evidence that paints the client in a negative light risk alienating the jury. Counsel were not ineffective for failing to object to the unfavorable references to Levine.

■ 5. Levine accuses the AUSA of prosecutorial misconduct during closing argument. He says the AUSA mischaracterized the evidence, assumed facts not in evidence, drew inferences not supported by the evidence, appealed to the jury's emotions, misstated the law, and distracted the jury from its sole mission to determine whether the evidence showed Levine to be guilty beyond a reasonable doubt. The Court has carefully reviewed the many instances where Levine says the AUSA made improper comments. In those instances, the AUSA either characterized the evidence correctly, or invited the jury to draw legitimate inferences from it, or mischaracterized the evidence in ways that were not material to Levine's guilt in light of the strong, painstakingly created picture of guilt introduced over a lengthy trial. The Court has also considered its having instructed the jurors to reach their verdict based only on the evidence and the law given by the Court, and to disregard the lawyers' comments in closing argument to the extent they were not supported by the evidence. Levine's trial and appellate counsel were not ineffective because they failed to

argue prosecutorial misconduct based on the AUSA's comments in closing argument. *See United States v. Richardson,* 130 F.3d 765, 779 (7th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 1324, 140 L.Ed.2d 486 (1998) (setting forth the test for analyzing alleged prosecutorial misconduct during closing argument); *United States v. Catalfo,* 64 F.3d 1070, 1081 (7th Cir.1995) (noting that instructions to disregard arguments not supported by the evidence can limit the damage done by counsel's mischaracterizing the evidence).

■ 6. Levine argues that the AUSA committed prosecutorial misconduct by indicting him under section 1958 because that statute is intended to combat organized crime, not garden-variety murders for hire, which are properly prosecuted in state court. Like the Hobbs Act, section 1958 contains no language suggesting it may be applied only to battle organized crime. *See* 18 U.S.C. § 1958; *United States v. Schweihs,* 971 F.2d 1302, 1316 (7th Cir.1992); *see also United States v. Dickson,* 816 F.2d 751, 752–53 (D.C.Cir.1987). Section 1958 has been routinely invoked in situations like Levine's with no apparent organized crime aspect. *E.g., United States v. Higham,* 98 F.3d 285 (7th Cir.1996); *United States v. King,* 75 F.3d 1217 (7th Cir.1996); *United States v. Carr,* 965 F.2d 408 (7th Cir.1992). Levine presents no authority which supports the proposition that the federal prosecutor lacked authority to prosecute him under section 1958. Counsel were not ineffective for failing to raise this meritless argument.

■ 7. Under the banner of "lesser included offense," Levine argues that he was impermissibly convicted of "conspiring to conspire." Levine bases this argument on the proposition that section 1958 is a conspiracy statute, as is the general conspiracy statute he was convicted of violating, section 371. Levine ignores that the language "or conspires to do so" was added to section 1958 in 1994, after his trial and appeal. Pub.L. No. 103–322. Before Levine's case and the 1994 amendment, at least one court had held that section 1958 did not require a conspiracy for a conviction. *United States v. Ransbottom,* 914 F.2d 743, 746 (6th Cir.1990). Counsel

were not ineffective for failing to raise this strained argument.

■ 8. Levine argues that the Court erred in sentencing him to life on all four counts brought under section 1958. Under that provision, a defendant is eligible for a life sentence only "if death results" from the murder-for-hire scheme. 18 U.S.C. § 1958(a). Levine argues that "death resulted" only from the last instance of interstate travel designated in count five, the instance that most immediately preceded the murders. He ignores the notion that all of the four charged instances of interstate travel collectively caused the deaths of Donald and Marsha, because they were all part of the same murder-for-hire scheme. Levine offers no authority for his strained reading of the statute. Counsel were not ineffective by failing to raise this longshot argument.

9. Levine charges the AUSA with prosecutorial misconduct for eliciting testimony (1) that defense counsel had subpoenaed but never put on the stand a witness that the AUSA called in rebuttal, and (2) that a witness believed Levine was guilty. As outlined in the previous ruling, the Court will consider only whether appellate counsel was ineffective for failing to appeal the denial of the mistrial motions trial counsel made in response to this testimony.

■ The comments at issue touched on Levine's right to silence and guilt in only a glancing way, and did so in the midst of a lengthy case the Government built on a mass of detailed evidence. Furthermore, the jury was instructed (1) to disregard the offending testimony, (2) that it was improper for any witness to suggest that Levine was guilty because only the jury could decide that question, (3) that Levine was presumed innocent, (4) that the Government had the burden of proof, and (5) that Levine had no burden to call witnesses or produce evidence. The denials of the mistrial motions would have been reviewed under the deferential abuse of discretion standard. In light of these circumstances, appellate counsel had no constitutional obligation to appeal the denials of the mistrial motions. See *United States v. Butler*, 71 F.3d 243, 253, 255 (7th Cir.1995);

*United States v. McKenzie*, 922 F.2d 1323, 1326–27 (7th Cir.1991).

■ 10. Levine argues that his appellate counsel rendered ineffective assistance by arguing on appeal that trial counsel was ineffective. Whether doing so constituted defective performance does not matter. The only prejudice that appellate counsel might have caused by arguing trial counsel's ineffectiveness on appeal would be barring Levine from arguing ineffective assistance ·of trial counsel again in his section 2255 motion. Through either the January 1998 ruling or this ruling, this Court has reviewed every instance of ineffective assistance by Levine's trial or appellate counsel that Levine now asserts.

11. Levine suggests that his counsel on the new trial motion rendered ineffective assistance. In the first place, Levine has produced no authority and the Court is aware of none that suggests that he had any constitutional right to counsel on his post-appeal new trial motion. In any event, Levine's arguments that counsel should have appealed this Court's abuses of discretion in denying the new trial motion are strained. The Court finds no basis for determining that counsel on the new trial motion delivered anything less than vigorous, competent representation.

### B. Other issues

The Court now turns to arguments that ostensibly have a basis, in whole or in part, outside the record of the trial and appeal.

1. Levine seeks relief on the ground that the AUSA who handled the trial of his case did not live in the Northern District of Indiana. At the time of Levine's trial, AUSA's were required to live in the district they served; since 1994, they may live within 25 miles of the district. 28 U.S.C. § 545(a); Pub.L. No. 103–322. The Government has not asserted that the AUSA on Levine's case did live in the district, so the Court assumes he did not. The question is whether that matters now.

■ A section 2255 motion may raise a jurisdictional challenge. *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir.1997). The only decisions that have squarely ad-

dressed a violation of the AUSA residency requirement concluded that the violation did not destroy jurisdiction. *United States v. Mitchell*, 136 F. 896, 906 (C.C.D.Or.1905); *United States v. London*, 424 F.Supp. 556, 566–67 (D.Md.1976), *aff'd sub nom, United States v. Clerkley*, 556 F.2d 709 (4th Cir. 1977).

Levine cites decisions where federal attorneys acted in a certain capacity without having been specifically and officially appointed to do so. Those decisions do not deal with the AUSA residency statute, and in any event do not suggest that lack of official appointment automatically deprives a district court of jurisdiction. *Wall v. United States*, 384 F.2d 758, 762–63 (10th Cir.1967); *Home News Pub. Co. v. United States*, 329 F.2d 191, 193 (5th Cir.1964). The decisions do suggest that defendants may waive any lack-of-appointment objection to government counsel by not raising it in a timely fashion. *Id.* Levine asserts—in his reply brief and without evidentiary support—that it was common knowledge that the AUSA who handled his case lived outside the district, yet he offers no explanation as to why he did not raise the lack of residency at trial.

Levine might argue that his trial counsel was ineffective by not raising the residency violation. But even if trial counsel had raised it and thereby barred that particular AUSA from handling the case, Levine offers no reason why the U.S. Attorney could not have had a different AUSA handle it, even reindicting Levine if necessary, and proceed to try Levine on the same evidence and achieve the same result. Levine's trial counsel had no Sixth Amendment obligation to raise the residency requirement merely to gain a change of AUSA's and a delay. And, as noted, the only on-point authority would have suggested to Levine's counsel that a residency violation was not a jurisdictional defect.

If, on the other hand, it was not common knowledge that the AUSA lived outside the district, then he was acting as a de facto AUSA, meaning his actions in Levine's case should be honored rather than upset the case now. *See Equal Employment Opportunity Commission v. Sears, Roebuck and Co.*, 650 F.2d 14, 17–18 (2nd Cir.1981). Indeed, the prosecution was conducted under the authority of the United States Attorney for this district, and nothing suggests he lacked authority to conduct it. *See United States v. Denton*, 307 F.2d 336, 338 (6th Cir.1962).

The decision in *United States v. Providence Journal Co.*, 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988) is distinguishable. Nothing suggested that the attorney there had even de facto status to argue before the Supreme Court, and the attorney's lack of authority to argue there was timely raised there.

Overall, any violation of the residency requirement, while it cannot be endorsed, did not amount to the type of defect that warrants upsetting Levine's conviction now under section 2255.

 2. Levine argues that his trial counsel had a conflict of interest. A conflict of interest is a form of ineffective assistance. *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052. To prevail on a conflict claim, a defendant must show both that counsel had an actual conflict, and that the conflict adversely affected counsel's performance. *Id.; Gray–Bey v. United States*, 156 F.3d 733, 742–43 (7th Cir.1998).

Levine describes the conflict as follows: Trial counsel's wife had "physical problems," so he needed to make a lot of money in a hurry by taking on "mob clients." Counsel's calendar was so full that he could not perform adequate investigation in the allotted seventy days before trial. Also, counsel did not have money to pay investigators because he had agreed to represent Levine for a fixed price. So, counsel relied on what he could get from the Government rather than doing his own investigation. There was a possibility that Levine's trial would go past the scheduled start of a trial of a mafia "capo" whom counsel was also defending. Counsel solved this scheduling dilemma by not putting Levine on the stand, which might have added two days to Levine's trial. So, without consulting Levine, counsel rested the defense case after calling only two witnesses. The Court was aware of counsel's scheduling conflict but failed to alert Levine to it.

▮ Levine says the scheduling conflict left counsel unprepared for trial and adversely affected his performance. A defendant may not raise a conflict-of-interest claim in a section 2255 motion without "a detailed and specific affidavit which shows that the petitioner ha[s] actual proof of the allegations going beyond mere unsupported assertions." *Gray–Bey*, at 743; *see also Barker*, 7 F.3d at 633 n. 3 (stating that a district court need not hold an evidentiary hearing on a section 2255 motion if the defendant offers only "mere conclusions" or "inherently unreliable" allegations). Regarding the existence of an actual conflict, Levine's brief offers only conclusory and unsupported assertions regarding the intimate details of trial counsel's personal life and work schedule. Regarding the effect of any conflict on counsel's performance, the record shows and this Court recollects that trial counsel put on a vigorous defense. *See Levine*, 5 F.3d at 1108–09. Levine has not adequately supported the notion that his trial counsel had a scheduling conflict which caused him to prepare inadequately for the case. *See Gray–Bey*, at 743; *Barker*, 7 F.3d at 633 n. 3.

Levine also asserts that trial counsel kept him from testifying because of the scheduling conflict. Here, again Levine's brief supplies a shaky basis for the notion that trial counsel was operating under an actual conflict. In any event, to make headway in his section 2255 motion Levine must do more than merely assert he was prevented from testifying—he must describe what his testimony would have been and show how it would have made a difference. *Underwood v. Clark*, 939 F.2d 473, 475–76 (7th Cir.1991); *United States v. Saadeh*, 1997 WL 391974 (N.D.Ill., Jul 10, 1997); *United States v. McNeal*, 1997 WL 208398 (N.D.Ill., Apr 22, 1997); *United States v. Davis*, 1997 WL 473873 (N.D.Ill., Aug 14, 1997). Levine offers only a vague assertion in his reply brief that he would have explained his flight after the attacks on Donald, Marsha, and Mark better than trial counsel did. Br. p. 17. Levine has not shown that he is entitled to section 2255 relief on the basis that trial counsel prevented him from testifying.

Finally, Levine cites one offhand reference at trial for the notion that the Court was aware that trial counsel wanted to get Levine's trial over quickly to proceed to the next trial, which triggered the Court's duty to investigate the possible conflict. Because Levine has not shown any actual conflict, the Court could not have failed in its duty to investigate one. *See Griffin v. McVicar*, 84 F.3d 880, 887 & n. 5 (7th Cir.1996) (trial court has a duty to investigate only when it knows or reasonably should know that an actual conflict exists) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 347, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

▮ 3. One of the AUSA's supposedly offending comments in closing argument rests in part on evidence outside the record and warrants particular discussion because Levine has focused on it. Louise Row testified at trial and was a neighbor and employee of Levine and his wife, Pat Steward. Row, Levine, and Steward were all living in Phoenix at the time of the murders. In closing argument, the AUSA claimed that Row had testified that on the day of the attacks, she received a call from Steward indicating that Levine's daughter might be in danger because there was "an alleged or supposed Phoenix connection with the murders." Tr. 847. Regarding this testimony, the AUSA later argued: "Ladies and gentlemen, that was the day of the murders. No one anywhere from the testimony was mentioning Phoenix that first day. Nobody. Why should they say Phoenix?" Tr. 3738.

▮ Contrary to what Levine suggests, the AUSA did not mischaracterize Row's testimony or argue an improper inference from it. What Row said could support the inference that Steward, the Defendant's wife, committed a slip of the tongue that suggested she knew who committed the murders. See TR. 845–47, 857–59. That is not the only inference one could draw from the testimony, but when evidence supports multiple legitimate inferences, the Government is entitled to argue the one that shows guilt.

Levine's argument does not stop here. As part of his new trial motion, Levine submitted a transcript of a police interview of Row taken a few weeks after the murders. As

discussed in the ruling on the new trial motion, Row's comments in this interview indicate that she heard about the "Phoenix connection" from the news. But that does not rule out that she heard about it both from Steward, as she testified at trial, *and* from the news later. Also, the transcript indicates that the tape side ended just as Row was about to say exactly when she heard about the "Phoenix connection" on the news, and it apparently picks up later in the conversation so we never get to hear what Row was going to say.

■ So, Levine argues, the AUSA committed prosecutorial misconduct by eliciting testimony from Row that conflicts with the police interview. (He also argues that the Government doctored the tapes, but that notion has no evidentiary support and the Court dealt with it in ruling on the new trial motion.) Yet, as already stated, the police interview does not necessarily contradict Row's trial testimony. Moreover, the police interview was not sworn, and was taken about eighteen months before the trial. The AUSA did not commit misconduct by taking Row at her word when she testified under oath at trial in a way that did not necessarily contradict her earlier unsworn statement.

■ Levine also suggests that his trial counsel rendered ineffective assistance by not impeaching Row with the police interview. Although the transcript of the interview is not in the trial record, in ruling on Levine's new trial motion the Court assumed it was available to trial counsel because the Government disclosed it. Counsel could not have admitted Row's comment in the interview for its truth because prior unsworn statements of a witness are hearsay. Fed. R.Evid. 801(d)(1). But perhaps counsel could have used it to show that Row's testimony about hearing of a "Phoenix connection" on the night of the murders was unreliable.

■ The question is whether trial counsel was ineffective for failing to impeach Row. He was not. The case against Levine was not built on Row's testimony. Rather, it was based on a mountain of evidence that collectively painted Levine as hiring McKinney to kill his family members. Trial counsel did a

solidly competent job in job in trying to poke holes in that evidence. *See Levine*, 5 F.3d at 1108–09. That he may have missed a minor impeachment opportunity during the course of a lengthy and complex trial does not render his performance constitutionally defective. The Constitution does not guarantee a perfect trial or perfect counsel, only a fair one with competent counsel. *United States v. Wilson*, 134 F.3d 855, 867 (7th Cir.1998); *Kavanagh v. Berge*, 73 F.3d 733, 737 (7th Cir.1996).

### III. CONCLUSION

For the foregoing reasons, the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody is **DENIED,** and the Clerk is **ORDERED** to **ENTER JUDGMENT** dismissing this section 2255 case with prejudice.