**UNITED STATES of America, Plaintiff,**

v.

**Damon SIMPSON, Defendant.**

**No. IP 96–CR–0078 H/F.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 27, 1996.

Major Coleman, Office of the United States Attorney, Indianapolis, IN, for plaintiff.

Patrick E. Chavis, III, Chavis & Chavis, Indianapolis, IN, for defendant.

### ENTRY ON DEFENDANT'S MOTION TO SUPPRESS

HAMILTON, District Judge.

Defendant Damon Simpson has been charged with possession with intent to dis-

tribute approximately 173 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1). Simpson has moved to suppress the cocaine and any other evidence found by police in his apartment. Simpson contends that the evidence was seized pursuant to an invalid search warrant in violation of his rights under the Fourth Amendment to the United States Constitution. Both sides filed briefs and the court conducted an evidentiary hearing on August 23, 1996. The court continued the hearing on August 26, 1996, when both sides had an opportunity to call additional witnesses. They chose not to do so, and presented only argument. The motion to suppress is now ripe for decision, and this entry states the court's findings of fact and conclusions of law to comply with Fed. R.Crim.P. 12(e).

The defendant's motion raises concerns at the core of the Fourth Amendment: the search of a private residence pursuant to a search warrant. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Two basic principles of Fourth Amendment law are central to the court's decision.

First, searching two or more separate apartments in the same building is no different than searching two or more completely separate houses. *E.g., United States v. Hinton*, 219 F.2d 324, 326 (7th Cir.1955). As discussed in detail below, when the police applied for the warrant to search the building that contained defendant Simpson's apartment, the police had ample reason to know that the building contained several separate residences and was not the "single-family residence" they described in their application for the search warrant.

Second, the decision to issue a search warrant must be made by a neutral judge. *E.g.,*

*McDonald v. United States,* 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). For that fundamental protection to have any value, the police must be candid with the judge and tell the judge about the facts they know that are material to determining probable cause and the scope of the probable cause. In this case, the police told the judge who issued the warrant only about one $20 controlled buy of cocaine at the front door of the building they described for him as a "single-family residence." They chose not to tell the judge about their prior visit to the building, and they chose not to tell him about the information they obtained on that visit indicating that the building contained several separate residences. They also did not tell the judge about the information they had obtained on that visit that might have allowed the judge to conclude that, despite the separate residences, the entire building was actually being used as a single unit under the dominion and control of the target of their investigation. See, *e.g., United States v. Butler,* 71 F.3d 243, 249–50 (7th Cir.1995). Because the police provided the judge with information that they should have known was wrong and that was critical to determining the scope of the search warrant, the warrant and search of Simpson's apartment were invalid. In addition, because the police were not candid with the judge, and because their failure to provide the relevant accurate information was at least in reckless disregard of the truth, the good faith exception to the exclusionary rule does not apply here. Accordingly, the fruits of that search must be suppressed, and defendant's motion to suppress will be granted.

### FINDINGS OF FACT

On April 8, 1996, Detective Walter Sanders of the Indianapolis Police Department (IPD) submitted a probable cause affidavit to Marion Superior Court Judge Richard Sallee stating that he had good cause to believe that cocaine was being kept, used and sold at a residence on 624 West Eugene Street in Indianapolis. The affidavit stated that the residence was under the control of one Cotriena Embers. Sanders stated in the affidavit that he based his belief on information from a reliable confidential informant who had purchased from Embers a substance described as cocaine at the Eugene Street address on April 6, 1996. The affidavit further stated that Embers had told the informant the substance was cocaine and that Sanders knew the informant was a past user of cocaine and was familiar with its appearance and packaging for sale. Based on this information, Detective Sanders requested, and Judge Sallee issued, a search warrant for the residence at 624 West Eugene Street and for Embers' person. Both the affidavit and the warrant described the structure as a "three (3) story single-family residence" consisting of "a living room, dining area, kitchen, bedroom(s) and bathroom(s)."

### A. The Building at 624 West Eugene Street

The building at 624 West Eugene Street is a brown three-story structure that looks like a single-family house from the outside. It has one front door. In the back there is a wooden exterior stairway that leads to small exterior landings on the second and third floors. From the outside of the building, there are no signs, such as multiple doorbells, mailboxes, or utility meters, to indicate that the building is anything other than a single-family dwelling.[1]

The interior of the building includes, however, five or six separate apartments. The front door leads into a hallway. Immediately to the right is an opening into a sitting area. On the right side of the hallway just beyond the sitting room are stairs to the basement and to the second floor. Further along the hallway on the first floor there is a door on each side of the hallway. Both doors have locks on them. One is marked "A" with black electrical tape, and the other is marked

---

1. Cf. *United States v. Williams,* 917 F.2d 1088, 1091 (8th Cir.1990) (evidence of multiple-family dwelling). Exhibit 1 is a photograph of the building from the back. It shows a sign on the back fence by the alley stating "Tenant Parking Only." Although a sufficient foundation was laid for admitting the photograph, the evidence was that the photograph was taken approximately a month after Simpson's arrest. The court finds that the "Tenant Parking Only" sign was not on the fence at any time relevant to this case.

"C." The markings on the doors are not readily visible to someone standing just inside the front door. Apartments "A" and "C" take up the rest of the first floor. Each contains a kitchen, and at least one contains a bathroom. Simpson testified that both of the first-floor apartments were occupied as of April 8, 1996; a Mike Matthews lived in "A" and Simpson said he did not know who lived in "C."

The second floor contains a common kitchen and bathroom near the top of the stairs from the first floor. The second floor contains either three bedrooms or a living room and two bedrooms. At least two bedrooms have separate locks, and the three doors are marked with letters "B," "D," and "E." According to Simpson, one of these bedrooms was occupied by Steve Shepard, the resident caretaker of the building, and his girlfriend Wanda Weaver. Cotriena Embers lived in another second-floor room. Tr. 20. Just off the second-floor kitchen is a door, behind which is a stairway leading to Simpson's apartment on the third floor. The third floor contains a bedroom, bathroom, kitchen area, and living room. Tr. 7, 15. The door leading to the stairway is the only internal door to the third-floor apartment; there is no door at the top of the stairs. Tr. 16. There are two locks on the door, which is also marked with a three-inch letter "F" made with black electrical tape. Tr. 29–30, 46. Simpson testified that he did not have a key to any of the other apartments' doors, and there is no evidence directly to the contrary.[2] Simpson's apartment occupies the entire third floor. In addition to the stairs leading to his apartment, there is another door leading outside to the small balcony at the top of the exterior stairs, enabling one to enter and exit the third-floor apartment without passing through the rest of the building.

**B. The Controlled Buy and the Warrant Application**

On Saturday, April 6, 1996, a confidential informant contacted Detective Sanders with information that cocaine was being sold from 624 West Eugene Street. Sanders came into work and arranged for and supervised a controlled buy of $20 worth of cocaine at 624 West Eugene Street. The confidential informant went to the front door of the house and stayed at the front door as she made the purchase from Cotriena Embers. The informant stayed in sight of Sanders at all times and did not enter the house.

Sanders prepared a probable cause affidavit and submitted it to Judge Sallee on Monday, April 8, 1996. The affidavit requested a search warrant for 624 West Eugene Street and described the building as

> a three (3) story single-family residence that is brown with beige trim and sits between 618 W. Eugene Street and 630 W. Eugene Street. Said residence consists of a living room, dining area, kitchen, bedroom(s) and bathroom(s). I request this search to include all rooms, closets, drawers, shelves, and personal effects contained therein and thereon where Cocaine, an extract of Coca may be concealed. I further request this search to include the person of Cotriena Embers B/F.

Judge Sallee issued a search warrant that contained an identical description of the building (as well as the quoted sentences in the probable cause affidavit beginning "I request" and "I further request").

**C. The Police Visit on March 18, 1996**

On March 18, 1996, six armed private agents and bondsmen working for a bonding agency went to the 624 West Eugene Street address to serve a "failure to appear" warrant on one Robert Harris. Tr. 74–75, 81. One of these agents was Todd Clark, who testified at the suppression hearing. After knocking repeatedly on the door, a woman opened the front door and ran back inside. The agents could not identify who opened the door for them. The six agents searched the entire building. They found Robert Harris with several other people on the third floor, in Damon Simpson's apartment. Harris and all other persons in the building at the time

---

2. During the police visit to the building on March 18, 1996, discussed below, they obtained some evidence that could support an inference that Simpson or others had access to the entire building. That evidence was not presented to the judge who issued the warrant.

claimed not to live there. Simpson was not present at the time of this incident.

Before the private bonding agents had entered the building, they had called the Indianapolis Police Department for "backup." Tr. 108. As the agents searched the building for Harris, they found a number of weapons, cellular phones, money, a gas mask, and a quantity of cocaine. After everyone present denied living in the building, the agents called in IPD. IPD officers Gerald Neumann and Doug Wright entered the building and were joined by another officer and a sergeant.

Clark testified that nothing about the structure indicated that it was a multi-unit apartment building. For example, he said, there were no multiple doorbells outside and no numbers or letters on the interior doors indicating separate units. Tr. 78, 76. He stated that he heard voices from behind a locked first-floor door, but he did not personally enter the area on the first floor that, according to Simpson, contained two apartments. Tr. 97, 81, 84.

IPD Officer Neumann also testified that on March 18, 1996, there were no multiple doorbells, mailboxes, or utility meters, and no numbers or letters on the interior doors. Tr. 107. He testified that the building "looked like a single family dwelling." Tr. 107. His conclusion, however, is at odds with some of his discoveries. He walked through the entire house. He found, for example, two kitchens on the first floor, each of which was in a separate unit. Tr. 109. One unit contained a kitchen, bedroom, sitting room, and bathroom. The other unit had a kitchen and sitting room, and Neumann could not recall whether it also contained a bedroom and bathroom. Tr. 109–10. Each unit had a door leading to the hallway. Neumann did not testify as to whether either or both doors were locked, but Clark had previously testified that at least one door was locked. Tr. 78. Neumann testified that he did not remember the common kitchen on the second floor. There was a fourth kitchen on the third floor where Harris and others were found.

Neumann wrote a report detailing the events of March 18. In his report, he listed the items that were seized on March 18: several firearms (including a sawed-off shotgun and a high-powered rifle with scope and tripod), a gas mask, ten or eleven cellular phones, money, clothing, electronics, and a "very large amount" of crack cocaine. Ex. 20. Neumann testified that the evidence was found "[t]hroughout the house." Tr. 104–05. Officers also found on the first floor an Indiana identification card belonging to Simpson. Tr. 105. In the "narrative" section of the report, Neumann wrote that Cotriena Embers told him that the building was a "boarding house." Neumann testified that he merely wrote down what Embers told him and did not personally believe that 624 West Eugene was a boarding house. Tr. 111, 106. However, Neumann's report contains no indication that the building is anything but a boarding house (albeit, one used for distributing cocaine). See Ex. 20; Tr. 112. His report went to the chief of police and was available to all Indianapolis police officers. Tr. 111–12.[3]

### D. Plans for Executing the Search Warrant

After carrying out the controlled buy on April 6, Detective Sanders learned from his partner, Detective Michael Forrest, that other police officers, including Doug Wright, had been to 624 West Eugene Street three weeks before. Tr. 151. Sanders talked to Wright later that evening of April 6 because he wanted to get from Wright a floor plan of the house. Wright told Sanders about the March 18 incident and told him about the guns, cocaine, cellular phones, and pagers that were found and confiscated. Wright told Sanders he thought it was a "dope house." Tr. 137. Wright also drew a floor

---

**3.** The narrative in the report stated that "Embers said *620* Eugene is a boarding house" (emphasis added), not 624 West Eugene. The government now argues that because Embers provided the wrong address, she may have been discussing a different house. However, as the probable cause affidavit indicates, the building called 624 West Eugene is the only building between 618 and 630 West Eugene, and no one claims to have been confused by the reference. Neumann testified that it was clear Embers was referring to 624 West Eugene. Tr. 114–15.

plan of the building and gave it to Sanders. Ex. 24. Sanders used this drawing to brief the officers who executed the search on April 8. Tr. 156. The drawing notes that Embers lived on the second floor. Tr. 157. Wright told Sanders that there were kitchens on both the second and third floors. Tr. 136. The drawing also indicates that were kitchens on both the first and second floors. Ex. 24.[4] Sanders admitted that there turned out to be two kitchens on the first floor. Tr. 163–64. Wright's drawing also shows living rooms on both the first and second floors. Sanders testified that he did not recall speaking to Neumann and did not read Neumann's report. Tr. 152–53. Instead, Sanders asserted, he relied entirely on Wright for the description of the building's interior. Sanders could not recall whether Neumann was at the pre-search briefing, though he stated that Neumann "was probably there." Tr. 158. He added that, even if Neumann had been at the briefing, he neither made nor corrected any statements that Sanders made. Tr. 171–72. Sanders concluded that everyone had assumed that 624 West Eugene Street was a single-family dwelling. Tr. 173.

■ In his probable cause affidavit submitted to Judge Sallee, Sanders did not even mention the March 18 incident, nor did he include any of the information discovered during that incident and conveyed to him by Officer Wright. Instead, he described only the controlled buy carried out on April 6, and stated that the building was a "three (3) story single-family residence" consisting of "a living room, dining area, kitchen, bedroom(s) and bathroom(s)." In light of information both known to Sanders and readily available to him from other officers, the court finds that Sanders' asserted belief that 624 West Eugene was a single-family dwelling was clearly unreasonable. The evidence shows that the building looked like a single-family dwelling from the outside. But the officers knew of four kitchens between them; two were upstairs and the other two were in separate units on the first floor. Sanders

knew of at least three when he applied for the warrant. Sanders also knew of at least two living rooms when he applied for the warrant. It was unreasonable under the circumstances for him to conclude without further investigation that a building with three or four kitchens on three floors is a single-family residence. Detective Sanders personally knew of three kitchens, yet failed to read Officer Neumann's report (which included Embers' claim that the building was a "boarding house") in the two days before the search warrant was executed. Then Sanders swore in his probable cause affidavit that the building was a "single-family residence" and had only one kitchen and one living room. That description was at least recklessly false.

**E. The Execution of the Search Warrant and the Arrest of Simpson**

Judge Sallee issued a search warrant for the entire building. On April 8, 1996, at approximately 8:30 p.m., Detective Sanders and approximately fifteen to twenty other IPD officers executed the warrant. The IPD team included Detective Sanders' two partners, a special weapons and assault team (SWAT team), and Officer Neumann and perhaps other uniformed officers. Sanders and another IPD officer had briefed the SWAT team shortly before the warrant was executed.

The officers planned to use battering rams to enter the building through both the front door and the exterior third-floor door into Simpson's apartment. After the police had entered the front door, officers outside the building in back saw Simpson on the landing outside his third-floor door throwing a package toward the house next door. The package turned out to contain more than 159 grams of crack cocaine. The government's brief asserts that Simpson was discovered throwing away cocaine "almost simultaneously" to officers' knocking and announcing their presence. Sanders testified that he was told that "[a]s the SWAT team began to make

---

**4.** On the drawing of the second floor, one of the rooms is clearly marked "kitchen." On the first floor, the word "kitchen" is not used; rather, the letter "K" marks a room that Sanders admits was, in fact, a kitchen. In light of the drawing as a whole—and especially because another first-floor room is marked by "L.V.", standing for living room—it is obvious that the letter "K" represents a kitchen.

entry he [Simpson] was observed on the third-floor balcony by the SWAT team tossing cocaine from that balcony." Tr. 145. Sanders admits, however, that he was not present during this event or during Simpson's subsequent arrest. Tr. 146. Officer Greg Wildauer was posted behind the house to secure the perimeter by the alley. He could see the third-floor landing. Wildauer testified that he saw Simpson throwing cocaine from the landing, and that the officers planning to enter the third-floor door were going up the outside steps in back with their battering ram when Simpson threw the cocaine next door. Tr. 117. Neither Wildauer nor Sanders, however, testified as to where the officers inside the building were when Simpson threw the package. Although the importance of that factual issue has been apparent since the defendant filed his motion to suppress, no officers who were inside the building during that stage of the action or during Simpson's arrest testified on either day of the hearing on the motion to suppress.

Simpson stated that he heard noises downstairs and then grabbed the package of cocaine from his table when he heard the door open to his apartment at the bottom of the interior stairs. He opened the door to the outside stairs, threw the package, and ran back inside. Simpson testified, as did Wildauer, that as he threw the drugs, there were officers on the outside steps leading to his apartment. Tr. 23. Simpson says he ran back inside, grabbed the rest of the cocaine from the table, and began running down the interior stairs. Tr. 23. At that point, according to Simpson, he was knocked down the stairs by police officers and arrested on the second floor. Tr. 50. Officers handcuffed him, took him back up to the third-floor apartment, and searched him, recovering an additional 12.5852 grams of crack cocaine and $1,900 in cash. Also present in the apartment were Embers, Shepard, and Weaver. Officers also recovered handguns, scales, pagers, and a cellular telephone from the premises. The government expressed doubt—understandably—about some of the details in Simpson's rendition of the sequence of these events, but his testimony on the facts critical to his motion to suppress is uncontradicted by the facts in evidence. Al-

though it is not entirely clear what happened inside during the seconds from the time Simpson threw the package from the balcony until he was arrested, the court finds from the uncontradicted evidence that Simpson did not discard the cocaine until *after* police officers had opened the second-floor door leading to his apartment.

## CONCLUSIONS OF LAW

### A. Voluntary Abandonment

Most of the cocaine found was recovered not in Simpson's apartment but from the neighbor's roof and back yard. The government contends that Simpson voluntarily abandoned that cocaine so that, regardless of whether the warrant or its execution were invalid, the Fourth Amendment is not implicated because Simpson had no reasonable expectation of privacy in contraband he discarded. Simpson argues that he did not lose his reasonable expectation of privacy in the drugs he discarded because his act of discarding was caused and prompted by the allegedly illegal entry into his apartment. Therefore, Simpson concludes, the evidence found on the neighbor's roof and in the yard was the impermissible "fruit" of an illegal search.

Under the "fruit of the poisonous tree" doctrine set forth in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), evidence gathered as a result of an unlawful search or seizure must be suppressed. Simpson relies on *Fletcher v. Wainwright,* 399 F.2d 62 (5th Cir.1968), in arguing that the "fruit of the poisonous tree" doctrine applies here. In *Fletcher,* two police officers without probable cause knocked and announced their presence at defendants' motel room door. The defendants failed to come to the door. The police heard what sounded like a suitcase opening and closing, and one officer circled the building while the other began kicking the door down. *Id.* at 63. The defendants threw some stolen jewelry out of the motel room window when the officer began kicking in the door, and then escaped through the window. *Id.* The defendants were later apprehended and the jewelry was found below the window in a

search of the motel grounds. *Id.* The district court found that even though the officers' entry into the motel room was unconstitutional, the jewelry was admissible because the defendants had no reasonable expectation of privacy in the motel grounds. *Id.*

The Fifth Circuit reversed, noting that every court that had considered similar situations had "uniformly held that the initial illegality tainted the seizure of the evidence since the throwing [of the evidence] was the direct consequence of the illegal entry." *Id.* at 64 (citations omitted). The court stated further that even though the officer who actually discovered the jewelry was properly on the motel grounds—and not attempting an illegal search—he was not an "independent source" sufficient to attenuate the nexus between the illegal police conduct and the discovery of the challenged evidence. *Id.* The Fifth Circuit concluded that since the entry was improper and the jewelry was thrown out of the window as a direct result of that illegality, "the police were not entitled to the fruits and the admission of the jewelry in evidence was reversible error." *Id.*

■ *Fletcher* and a line of similar cases have made clear that, for evidence to be admissible under a theory of voluntary abandonment, "an abandonment must be truly voluntary and not merely the product of police misconduct. In evaluating [defendant's] argument, we must determine whether there is a causal nexus between the unlawful police conduct and [defendant's] abandonment." *United States v. Roman*, 849 F.2d 920, 923 (5th Cir.1988) (abandonment of luggage prompted by agents' lawful questioning at airport involved no nexus with any unlawful police conduct) (citation omitted). Accord, *e.g., United States v. Bailey*, 691 F.2d 1009, 1014 & n. 3 (11th Cir.1982) ("voluntary" means not caused by police misconduct); *United States v. Barber*, 557 F.2d 628, 632 (8th Cir.1977) (evidence left in police car after illegal arrest held inadmissible because discovery of the evidence was a direct result of the unconstitutional seizure of defendant's person); *United States v. Newman*, 490 F.2d 993, 995 (10th Cir.1974) (drugs left behind as a result of illegal search of rear compartment of camper held inadmissible). Of course, if

the abandonment is truly voluntary—*i.e.,* not caused by police misconduct—evidence found is admissible even if there was a prior or subsequent illegal search or seizure. *E.g., United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir.1982) (holding that abandonment was not caused by police misconduct where defendant left bags in open view before officers had knocked on door to gain admission, because officers had not yet done anything illegal); *United States v. Kelly*, 551 F.2d 760, 763 (8th Cir.1977) (evidence found in a bag under a stairwell in defendant's apartment building held admissible even though discovery followed an illegal search of defendant's apartment, because search of apartment was fruitless and provided no information that led to the otherwise legal search of the hallway and stairwell); cf. *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) ("Objects falling in the plain view of an officer who has a right to be in the position to have the view are subject to seizure and may be introduced in evidence.").

■ The evidence in this case shows that Simpson threw the cocaine off his balcony in response to hearing officers opening the door to his apartment. Therefore, the "abandonment" theory is not applicable here. There was a sufficient nexus between the officers' conduct and the discovery of the challenged evidence, so the drugs seized were clearly the "fruits" of the officers' conduct. The central question in this case is whether the officers' conduct itself violated Simpson's Fourth Amendment rights.

**B. Legality of the Search**

Simpson's apartment was "searched" on April 8, 1996, and the government does not contend that the search fits any exception to the warrant requirement. Accordingly, the validity of the search depends on the initial validity of the warrant and, if the warrant was valid, on the reasonableness of its execution. The warrant incorrectly described the building as a "single-family residence." At issue here is whether the warrant obtained based on this incorrect description violated the Fourth Amendment.

## 1. Warrant Requirement

The Fourth Amendment "protects people, not places," *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), and specifically "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). Nowhere is an expectation of privacy more legitimate than in the home. *E.g., Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (stating that it is "axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed") (citations omitted); *Payton v. New York,* 445 U.S. 573, 582, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980) ("At the core of the Fourth Amendment, whether in the context of a search or an arrest, is the fundamental concept that any governmental intrusion into an individual's home or expectation of privacy must be strictly circumscribed.") (citations omitted); *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring) ("a man's home is, for most purposes, a place where he expects privacy"); *Reardon v. Wroan,* 811 F.2d 1025, 1027–28 (7th Cir.1987) ("the chief protection of the Fourth Amendment is directed toward the privacy of the home") (citations omitted). As the Supreme Court explained in *Payton:*

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... homes ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511 [81 S.Ct. 679, 683, 5 L.Ed.2d 734]. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

445 U.S. at 589–590, 100 S.Ct. at 1382 (alterations in original).

The Fourth Amendment does not differentiate among types of "homes." The term is of course broader than, for example, a single-family house. See *Maryland v. Garrison,* 480 U.S. 79, 90, 107 S.Ct. 1013, 1019, 94 L.Ed.2d 72 (1987) (Blackmun, J., dissenting) (Fourth Amendment protection applies to an apartment, "the equivalent of a single-family house"), citing *Ker v. California,* 374 U.S. 23, 42, 83 S.Ct. 1623, 1634–35, 10 L.Ed.2d 726 (1963); *McDonald v. United States,* 335 U.S. 451, 454–55, 69 S.Ct. 191, 192–93, 93 L.Ed. 153 (1948) (defendant's room in a "rooming house" treated as a home); *Serpas v. Schmidt,* 827 F.2d 23, 28 (7th Cir.1987) (holding that on-track dormitory rooms for racetrack employees were "homes" under the Fourth Amendment even though they were small, temporary, located near stables, and accessible to track authorities by master keys).

The principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment, which generally prohibits unreasonable searches and seizures. A basic Fourth Amendment principle is that searches of a home without a valid warrant are *per se* unreasonable unless the government shows consent or "exigent circumstances." *E.g., Welsh,* 466 U.S. at 748–49, 104 S.Ct. at 2096–97; *Steagald v. United States,* 451 U.S. 204, 216, 101 S.Ct. 1642, 1649–50, 68 L.Ed.2d 38 (1981); *United States v. Cotnam,* 88 F.3d 487, 495 (7th Cir.1996) ("The Fourth Amendment prohibits the police from making a warrantless nonconsensual entry into a suspect's home in order to make a routine arrest or to conduct a search.") (citations omitted). Since there is no evidence here of consent or of exigent circumstances, the issue here is whether the warrant was valid.[5]

---

**5.** The government argues that exigent circumstances existed when officers saw Simpson throwing drugs off his balcony. See *United States v. Howard,* 961 F.2d 1265, 1267 (7th Cir.

### 2. "Oath or Affirmation" Requirement

To be valid, a warrant must be issued by a detached and neutral magistrate upon a showing of "probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. This fundamental requirement is designed to "interpose[ ] a magistrate between the citizen and the police ... so that an objective mind might weigh the need to invade [an individual's] privacy in order to enforce the law." *McDonald v. United States*, 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). As Justice Jackson stated in *Johnson v. United States:*

> The point of the Fourth Amendment ... is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. *Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime....* The right of officers to thrust themselves into a home is ... a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (emphasis added; footnote omitted). As a result, "an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate." *Aguilar v. Texas*, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964) (reviewing court may not consider information not provided to the magistrate in the probable cause affidavit), *overruled in part on other grounds, Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); accord, *United States ex rel. Saiken v. Bensinger*, 489 F.2d 865, 867 (7th Cir. 1973), citing *Aguilar*.

■ Based on the information provided in Sanders' affidavit, Judge Sallee concluded that the police had probable cause to search both Embers' residence and her person. Neither party disputes this finding. Insofar as the government contends that it had probable cause to search a broader area than that allowed by Judge Sallee, however, this court may not uphold the warrant based on evidence and information not provided to Judge Sallee.[6]

### 3. The "Particularity" Requirement

■ In addition to the probable cause and "oath and affirmation" requirements, a valid warrant must describe with particularity the place to be searched. U.S. Const. amend. IV. As the Supreme Court reasoned in *Maryland v. Garrison*, the "purpose of the particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." 480 U.S. at 84, 107 S.Ct. at 1016. Absolute perfection in description is not required; rather, it "is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925).

■ Special problems arise when the place to be searched is in a multiple-occupancy building. Generally, "searching two or more apartments in the same building is no different than searching two or more completely separate houses.... [P]robable cause must be shown for searching each resi-

---

1992) (exigent circumstances exist where a reasonable person would believe that entry is necessary to prevent physical harm to officers or others, the destruction of evidence, or the escape of suspect). However, as discussed above, if the officers' illegal conduct caused Simpson to discard the drugs—*i.e.*, if the officers created the exigency—they may not rely on an "exigent circumstances" theory.

6. As discussed below, such evidence may be relevant to the good faith exception to the exclusionary rule.

dence." *United States v. Hinton,* 219 F.2d 324, 326 (7th Cir.1955). Thus, a warrant describing an entire building when cause is shown for searching only an apartment is void. *Id.* Similarly, a warrant generally describing a multiple-unit building when cause is shown merely that illegal activity is occurring somewhere in the building is void. *Id.* The evidence here shows that 624 West Eugene Street contained separate apartment units when the search was carried out on April 8, 1996, so the finding of probable cause to search Cotriena Embers' residence could not support a search of Simpson's third-floor apartment.

There are, however, two exceptions to the general rule about separate apartments. First, if the officers at the time a warrant was sought neither knew nor should have known that a building contained multiple units, a warrant describing an entire building will not be declared invalid merely because it later turns out that the description of the place was broader than appropriate. *Garrison,* 480 U.S. at 85, 107 S.Ct. at 1017. (*Garrison* also makes clear, however, that if such a mistake is made and then discovered in the course of executing the search, the search must be discontinued. *Id.* at 87, 107 S.Ct. at 1018.) Second, a warrant describing an entire building is not invalid if the magistrate finds that the building, although appearing to contain several units, is actually being used as a single unit or is under the "dominion and control" of the target of the investigation. *E.g., United States v. Butler,* 71 F.3d 243, 249 (7th Cir.1995), citing *United States v. Hinton,* 219 F.2d at 326. The government contends that both exceptions apply. For the following reasons, the government's arguments are not persuasive.

### (a) *Garrison* Exception

■ Sanders' affidavit clearly established that the police had probable cause for a search of the residence of Cotriena Embers, the purported target of the search. As it turned out, however, Embers lived in a second-floor apartment and not in the entire house. Simpson contends that the officers, both prior to securing a warrant and prior to the search, either knew or should have known that the building at 624 West Eugene Street contained multiple units. The evidence showed that the separate apartments have their own separate doors with locks, and each was distinctly labeled by a letter on the door. More important, Sanders himself knew of at least three of the four kitchens in the building, one on each floor, before he applied for the warrant. Sanders also had Wright's drawing, which showed at least two living rooms. In addition, Sanders had access to Neumann's report stating that Embers had said the building was a "boarding house," and to Neumann himself, who knew of yet a fourth kitchen located on the first floor.[7]

The government maintains there was no reason to believe that the building contained multiple units. It points out—and the court agrees—that the building appeared from outside to be a single-family dwelling since there were no multiple mailboxes, utility meters, doorbells, or name signs. Also, the entrances to the multiple units are not observable from the entrance to the building, so officers could not have realized there were multiple apartments until they were inside. Accordingly, the government argues that the warrant was valid under *Garrison.*

In *Garrison,* the Supreme Court held that a mistakenly overbroad warrant is invalid only if the officers, in light of information available to them at the time they applied for the warrant, either knew or should have known the true character of the dwelling. In *Garrison* the warrant authorized a search of "third floor apartment" when there were actually two third-floor apartments in the building. The record showed that the police had made specific inquiries about the issue, including checks of police records and a utility company's files. 480 U.S. at 85–86 n. 10, 107 S.Ct. at 1017 n. 10. Although it might have been possible for the police to have

---

**7.** Neumann testified that he did not believe Embers when she told him the building was a boarding house. He need not have accepted her claim, but his report is relevant here because it was relevant evidence available to Detective Sanders, who already had sufficient information to require further inquiry. Embers' claim, as reported by Neumann, should have provided Detective Sanders with further reasons to investigate the problem more carefully.

learned by more thorough inquiry that there were two third-floor apartments, the Court concluded that the police had nevertheless acted reasonably. *Id.* at 85–86, 107 S.Ct. at 1017–18.

In arguing that the officers' mistaken belief about the nature of the building was reasonable, the government relies principally on *United States v. Williams,* 917 F.2d 1088, 1089–90 (8th Cir.1990), which followed and applied *Garrison.* In *Williams,* police officers were given information that cocaine was being sold out of a building identified as a single-family residence belonging to Small. In fact, however, Small occupied only one room of what was described as a "rooming house." The police found cocaine in defendant Williams' room, and he moved to suppress the evidence. At the hearing, Williams pointed out that there were seven doorbells next to the front door, there were numbers and deadbolt locks on the individual units, and officers had made six prior visits to the house (although they never proceeded past the front foyer). The district court, nonetheless, found that it was not unreasonable for the officers to believe the building was a single-family house. Since officers had not been inside, they would not have seen the numbers or locks on the doors. The court determined that since the building had a common entrance, driveway, and mailbox, the only indicia of a rooming house were the doorbells. As for the doorbells, the court found that they were difficult to see and believed the officers' testimony that on all prior visits, the police either knocked or arrived at night and thus would have had no reason to see the doorbells. In addition, police had checked to see in whose name the gas and electricity were registered. The Eighth Circuit upheld the district court's findings as not clearly erroneous. *Id.* at 1092; see also *Garrison,* 480 U.S. at 85–86 & n. 10, 107 S.Ct. at 1017–18 & n. 10 (belief that there was only one unit on third floor was reasonable because electric company listed only the suspect as living on third floor and had no records of multiple units, police records confirmed suspect's address as "third floor," and suspect, who gave the officers the keys to enter the building, did not indicate that there were multiple units).

Here, both sides agree that the building appears from outside to be a single-family dwelling. If the controlled buy at the front door of the house on April 6, 1996, had been the only information that Detective Sanders had about the house, then the exception applied in *Garrison* and *Williams* might have been applicable. However, unlike *Garrison* and *Williams,* officers had been inside this house very recently. Between them, they had found four kitchens and at least three living rooms. Sanders' testimony showed that he knew of three kitchens in the building: Wright told him of kitchens on the second and third floors, and Wright's drawing indicates another kitchen on the first floor. Neumann's report uses the term "boarding house." Wright's drawing shows living rooms on the first and second floors. The drawing does not show additional living rooms in the first- and third-floor apartments.

In *Williams,* the primary factual issue was whether the officers actually knew there were multiple doorbells. Here, by contrast, the question is whether Sanders, having actually known of the multiple kitchens and living rooms, could have reasonably concluded without further investigation that the building was a single unit and then stated that conclusion in the sworn affidavit for probable cause. The government notes that all the rooms in the building in *Williams* contained full-size appliances. Gov.Br. at 8. Again, however, the officers in *Williams* had not been inside the building before executing the search warrant. While it is true that the court in *Williams* allowed the officers some "latitude" for failing to notice the appliances or consider their implication "in haste of their search," *Williams,* 917 F.2d at 1092, the same latitude is not justified on these facts. There is no question that the officers here noticed the number of kitchens and living rooms before the application for the search warrant was made. There was no such "haste" involved when they failed to recognize the contradiction between the explicit claim in the probable cause affidavit that the building was a "single-family residence" with one kitchen and one living room and the fact

that it had four kitchens and several "living rooms."

In light of all the information readily available, it was unreasonable for the police to conclude that 624 West Eugene Street was a single-family residence. At the very least, police officers should have investigated further, as they had in *Garrison* and *Williams*. Accord, *United States v. Andrews*, 713 F.Supp. 1319, 1321 (D.Minn.1989) (holding, under *Garrison*, that officers should have known that building contained two separate apartments because officers prior to search noticed two separate voice boxes by front door and a letter indicating two apartments; this information should have prompted further investigation). The exception established in *Garrison* and *Williams* for good faith and reasonable mistakes about the nature of the premises does not apply here.

### (b) "Single Unit" Exception

 The government also contends that the warrant was valid under the "single unit" theory, asserting that Sanders believed that Embers occupied the entire structure because he thought it was a single-family dwelling. In *Hinton*, 219 F.2d at 326, the Seventh Circuit stated the general rule that a warrant describing an entire building when cause is shown for searching only one apartment is void. There is an exception, however, where "although appearing to be a building of several apartments, the entire building is actually being used as a single unit." *Id.;* see also *United States v. Johnson*, 26 F.3d at 694 (rule requiring suppression of evidence obtained pursuant to overbroad warrant does not apply if "the targets of the investigation have access to the entire structure"). Under the *Hinton* "single unit" exception, "a finding of probable cause as to a portion of the premises is sufficient to support a search of the entire structure." *United States v. Butler*, 71 F.3d 243, 249 (7th Cir.1995) (warrant authorizing search of a three-unit building was valid where officers reasonably believed that the target of the investigation, although living on the second floor, was using first floor as security checkpoint) (citing *Johnson*, 26 F.3d at 694–96). Accord, *United States v. Gusan*, 549 F.2d 15, 18 (7th Cir.1977) (warrant valid for entire residence where defendant had "dominion and control" over the first floor and used it for access to second-floor gambling ring).

The "single unit" or common dominion and control exception is not available to the government here. In cases where it has been applied, the officers knew when they submitted their affidavits that the targeted buildings were multiple-unit structures, but had information indicating that the suspects had dominion and control over all the units. In this case, in view of the findings of Officers Neumann and Wright on March 18, 1996, with guns, cocaine, and related items found throughout the building, a belief that the building was being used as a "single unit" or was under common dominion and control might well have been reasonable. However, in cases applying the single unit or common dominion and control exception to buildings known to consist of multiple units, the critical fact is that the police officers *raised the issue with the judges in their applications for warrants*. As a result, the neutral judge could evaluate the facts and could decide the breadth of the warrant. See *Butler*, 71 F.3d at 249–50 (detailing grounds for belief stated in affidavit); *Johnson*, 26 F.3d at 695 (noting that affidavit identified premises as "two-family residence"); *United States v. Gusan*, 549 F.2d at 16–17 (affidavit identified premises as two-story duplex and specifically requested authority to search both upper and lower levels); accord, *United States v. Whitney*, 633 F.2d 902, 908 (9th Cir.1980) (informant told police that target "had the run of the residence" and police did not know of separate residences).

The problem here is that, although Detective Sanders now claims to have believed that Embers controlled the entire multi-unit structure, he never communicated such a belief to the judge, let alone any facts supporting such a belief. Instead, Sanders signed and submitted a probable cause affidavit that told only of the controlled buy and blandly described the building as a single-family residence with one kitchen and one living room. He told the judge nothing about the March 18, 1996, incident or the information it produced. See *Aguilar*, 378 U.S. at 109 n. 1, 84 S.Ct. at 1511 n. 1 (reviewing court may not

consider information not provided to the magistrate in the probable cause affidavit); *United States v. Hinton*, 219 F.2d at 326 ("validity of the warrant is dependent on the facts shown in the affidavit before the issuing authority").

One essential element of the Fourth Amendment's protections is that the police are not entitled to decide for themselves whether a warrant should be issued or, if so, its appropriate scope. Those are decisions that must be made by neutral judges. As the Supreme Court explained in 1948 in *McDonald v. United States:*

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was not done to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.

335 U.S. at 455–56, 69 S.Ct. at 193. Here the police obtained a search warrant, but they did so without giving the judge—the "objective mind"—the relevant information they had that was critical to deciding the proper scope of the search. The common dominion and control exception is not available here, where the police failed to tell the judge about the information they had that might have supported reliance on that exception. The search warrant was unconstitutionally overbroad.

### C. Good Faith Exception

Finally, the government relies on the "good faith exception" to the exclusionary rule to argue that even if the warrant was invalid, the court should not suppress the evidence seized from the search of Simpson's apartment. The good faith exception provides that "the exclusionary rule should not be applied when the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and

neutral magistrate that subsequently is determined to be invalid." *Massachusetts v. Sheppard*, 468 U.S. 981, 987–88, 104 S.Ct. 3424, 3427, 82 L.Ed.2d 737 (1984), citing *United States v. Leon*, 468 U.S. 897, 922–23, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677 (1984). The good faith exception does not apply, and thus suppression remains an appropriate remedy, "if the magistrate or judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923, 104 S.Ct. at 3421, citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In such a case, an officer's reliance on a warrant to effect a search cannot be considered objectively reasonable. *Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir.1985).

Here, as discussed above, Detective Sanders told Judge Sallee nothing about the March 18, 1996, incident and merely described the building as a "single-family residence." He also made one very specific and demonstrably false factual assertion: he stated that the 624 West Eugene Street building contained only one kitchen and one living room. As he all but admitted during the suppression hearing, he knew at the time he obtained the warrant that the house had multiple kitchens. He planned the raid from a drawing that showed two living rooms. Based on the evidence at the hearing, the court finds the affidavit to have been made with reckless disregard of the truth concerning the nature of the building.

However, even deliberately false misstatements in an affidavit do not necessarily bar reliance on a warrant where the misstatements are not material to the determination of probable cause. See *Franks v. Delaware*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85; *United States v. Ferra*, 948 F.2d 352, 353 (7th Cir.1991). In *United States v. Johnson*, the police officer who obtained the warrant did not recite in the affidavit all the evidence he had collected showing that the building was under the common dominion and control of the target of the investigation. The Seventh Circuit determined that the affiant's omissions—while not reckless or deliberate in any event—did not make the affidavit

misleading to the magistrate judge. 26 F.3d at 695 (citing *Leon,* 468 U.S. at 923, 104 S.Ct. at 3420–21). The reason was that, by correctly describing the house as a "two-family residence," the affiant informed the judge of the nature of the house. This disclosure put the issue of probable cause and the appropriate scope of the search squarely before the judge, enabling the judge to consider whether the police had presented sufficient information to justify a search of the entire house.

In this case the misstatements in the affidavit were misleading on a question critical to the judge's decision to issue a warrant for the entire building without further inquiry. If Detective Sanders had informed the judge that the building had multiple kitchens and living rooms, it is highly probable that the judge would have concluded that the building probably had multiple units and could have required a more particular description of the specific unit to be searched. If Sanders had even admitted any room for doubt about the nature of the building, the judge could have considered whether further inquiry was needed. In either case, if the police had also provided the details of the March 18, 1996, incident, the judge might well have issued a warrant for the entire building. Instead, Sanders chose to keep from the judge the existence of an issue concerning the nature of the building. By providing the judge with false information and keeping this issue from the judge, the police removed their ability to rely on the good faith exception here.

## CONCLUSION

With the benefit of hindsight, and in view of the cocaine, guns, and other items seized at 624 West Eugene Street, there is little room for doubt about the uses of the building. Accordingly, suppression of the contraband seized is no cause for celebration. The Fourth Amendment extends its protections of privacy to all, however. The obligation of the police to comply with the Fourth Amendment is an essential foundation of this nation's freedom, just as the security provided in large part by effective law enforcement is a necessary condition of our freedom. The decision on defendant's motion to suppress in this case depends on two key principles of Fourth Amendment law. First, probable cause to search one person's residence does not establish probable cause to search another person's residence, even if they are separate apartments in one building or separate rooms in a boarding house. Second, when seeking search warrants from a judge, the police have an obligation to be truthful with the judge. Both of those principles were violated here. Defendant's motion to suppress evidence seized from the search of his apartment on April 8, 1996, must therefore be, and is hereby, GRANTED.

So ordered.